Fairfield Hills?

A No, sir.

Q Were you ever counseled about anything when you were at Fairfield Hills?

A Not that I can remember.

Q So your testimony is your record was perfect at Fairfield Hills?

A I would say so.

Q And you got a written evaluation every year when you were at Fairfield Hills?

A Yes, sir.

Q Other than the incident by Miss Fairbrother and this incident involving Miss Talbot?

A Talbot.

Q Is there anything else that forms the basis of your complaint here that you worked in a hostile and dangerous work environment?

A I wore Tweed pants, Tweed short pants, not short pants, they were like to my knees, they call them skorts, and I wear long boots, long leather boots to like my knees. I came to evaluations, no one said I shouldn't wear those things, no one said. I was on unit 3, I did my first evaluation. Well, when I started on the orientation, I did it on unit three, and that was my first encounter with Miss Caplan.

Page 48

A Miss Chambers was an acting -- she was a supervisor, acting DN1.

Q Did she say that to you?

A She didn't say it to me, but when I went there it was told to me, and I didn't go by hearsay, I kept it to myself. When the first evaluation was given to me, Mary Talbot made lots of mistakes, I made lots of mistakes. I'm new, I'm a staff nurse, she's a head nurse, and I figure we'll work nicely together. Thelma -- I said Mary, you did this, you did that, but I corrected it. Mary wrote me up for every single mistake I made. So when we went up to the office to get my evaluation to decide --

Q Is this your first evaluation?

A Yes, sir.

Q All right, go ahead.

A To decide whether they'll keep me or I'm leaving, my evaluation was so bad, and I said, Mary, why? Mary sat in that room where that woman bashed me in what we call the chart room, or we call it the kitchen sometimes, and tears came out of her eyes, and she said, It's not coming from me, Thelma, it is coming from above.

Q Did she tell you who she was referring to?

A Administration.

in 1998, what other information, if any, makes up the basis of your allegation that you were subjected to a hostile and dangerous work environment, in paragraph 12 of your complaint?

A Your question, sir?

Q My question is other than the incident with Miss Fairbrother in 1998, what other incidents, if any, make up your allegation that you've been subjected to -- let me rephrase it. That for an extended period of time you have had to work in a hostile and dangerous work environment, as you state in paragraph 12 of your complaint?

A Oh. We had -- my head nurse there that I worked with, and there were only rumors, it wasn't told to me.

Q Who are you referring to, what head nurse?

A The head nurse on unit 5.

Q Who was that?

A Let me remember the name now. Mary Talbot.

Q What do you want to tell me about Mary Talbot?

A Well, I wear jewelry. When I left England, we wore scarfs, and we fixed them really quite neatly and fixed them like that. I figured I'm in another unit, another hospital working, and there were things there in that hospital that were not allowed there, but instead

went to Fairfield Hills.

Q Did Miss Fairbrother also work in that same unit while you were there after this incident until you left?

A No, she worked the first shift, I worked the second shift, but I worked on 41 and she worked on that unit.

Q Was this an overtime shift that you were covering that particular day?

A I was covering that one day overtime.

Q So would it be a fair statement that you weren't regularly assigned with Miss Fairbrother in 1991?

A No, I was not.

Q And other than this one isolated incident, you didn't deal with her on a daily basis after that?

A No, I didn't.

Q Other than that incident in 1991, were there any other incidents involving Miss Fairbrother before the 1998 incident?

A No. Oh, correction. The night -- I told you work a lot of overtime. The night before the night she bashed me, it is a corner -- I'm coming from, we call it the kitchen, you have the coffee pot and you have the cards, the cardexes there for the patients, and the

left, and she went to -- on grounds in the building they call stop and go where they smoked and drank coffee and whatever. We had few other patients left on the ward who were not allowed to go to stop and go or go on grounds, they had no grounds pass or anything like that.

Q You're speaking about where the phlebotomist went?

A No, I'm talking about the unit now. The phlebotomist left.

Q She said she went?

A The phlebotomist left.

Q Went to stop and go?

A No. After the phlebotomist left, the patient had a grounds pass, she went to stop and go.

Q Okay.

A That is what I heard, she would go there and drink coffee and smoke. The phlebotomist came back, they sent another one who is used to taking the blood, who knows how to do her blood.

Q An experienced phlebotomist?

A Right, and when the phlebotomist came back I said, Well, the patient left. She said, Well, we have to get the blood, so I asked Miss --

Q Fairbrother?

A Fairbrother to go and bring Miss -- the

A Well, I don't remember who was assigned to sit there.

Q At that time.

A At that time.

Q Do you know if Miss Morrison spoke with anybody, any other staff members on the unit on that shift when she did her investigation, if she did one?

A I don't know.

Q Would it be a fair statement to say, then, that if she did talk to people, you don't know what they said about that incident?

A I don't know if she spoke with anyone.

Q When you told me you filed -- you asked the police to file a report and they did with Middletown?

A That is what they said.

Q And you checked on that to see if they had done that, right, is that what you told me earlier?

A No, I didn't check, I asked them, the police, what they were doing about this.

Q You never followed up on whether a report had been filed with the Middletown Police?

A No, I never called them.

Q Did you ever file a report yourself separately with the Middletown Police?

A No, I didn't know I could do that.

Q Did you make any comments to her when she came in initially?

A No, none.

Q Then you went to the telephone and what did you do?

A Called the supervisor.

Q Did the supervisor come down?

A She was not there.

Q Did you report it later on to her?

A I reported it later on to her.

Q Now, was there any other nurses or any other staff on duty that night?

A Yes, there was a head nurse on duty that night.

Q Do you know if she was down the hall?

A She was in the office.

Q How far away was the office?

A Oh, I would say from, the length and a half of this room.

Q More than ten feet?

A I would say so, probably.

Q Less than 20?

A I can't judge like that.

Q You don't know?

A No, I don't know.

A And I was facing the TV.

Q What happened then?

A Miss Fairbrother came from -- through the door, over back of me, and I heard a faint, "Excuse me, excuse me." It was so fast I didn't get a chance to turn left nor to turn right, I had the chart in my hand, and she went bam.

Q Bam?

A Yes. And I spun around, and if I didn't hold on sort of like on the chart rack and the TV, I would have fallen.

Q Did she spin you around 180 degrees or 360?

A I would say 180 degrees.

Q So if you were facing the TV, after you spun around, you're now facing away from the TV?

A Around, yes.

Q And what part of her contacting your body, what part of your body was hit?

A Her. She contacted my left side. Now -- yes, she contacted my left side. Not the right side, but this side.

Q That's your left side.

A Right.

Q Were you still holding the chart in your hand when she made contact with you?

supposed to call the doctor to get an order when a person is in restraints, you get an order to renew the restraints after three hours.

Q Excuse me, were you sitting or standing when you were reviewing this?

A I was standing. And my face was back, backing the door. There was a chart rack over the side of the wall, and it was like close quarters. I stood there, and I realized I had pulled the wrong chart.

Q You're facing the chart cabinet?

A No, I am -- may I show you?

Q Well, do the best you can to explain to me in words?

A The chart rack was alongside of the wall, and my side, my left side was like side of the chart rack.

Q Let's do this. I'm going to ask you to draw this for me, if you would.

MR. JORDANO: Could you mark this as Exhibit 2, please. This piece of paper

(Defendants' Exhibit 2: Marked for Identification.)

BY MR. JORDANO:

Q Ms. Bishop, I'm going to hand you a blank piece of paper, it's got some lines on it, but you can ignore that, and a pen, if you would do me a favor. If

Page 32

Q Did you keep a record of that visit somewhere in your files?
A Of going to --
Q The walk-in clinic.
A The walk-in clinic. I didn't keep it, but I'm sure I can get it.
Q I'll ask to you produce that, if you would.
Did you file a workers' compensation claim?
A Yes, I did.
Q What was the result of that claim?
A They did not believe me, but they paid me for the 17 days I was out of work.
Q They paid you workers' comp for those 17 days?
A Paid me for the sick time. I took my own sick time and stayed out.
Q So you were paid on your sick leave?
A Right.
Q So they didn't pay you workers' compensation for that?
A I don't think so.
Q Was anybody else present when this incident occurred besides yourself and Miss Fairbrother?
A No, I was in the back room.
Q Do you know if -- did you ever check to see if a report was filed with the Middletown Police?

A 1998.
Q Do you remember what month?
A Around February or March, I'm not quite sure.
Q Do you remember what day?
A No.
Q So the incident occurs somewhere in February or March, you believe of '98; is that right?
A Yes, I think so.
Q And then the police come to your room?
A Yes. I went to the office and complained to the supervisor.
Q Who was that that you complained to?
A The supervisor left, she is no longer there.
Q What is her name. What is the name of the supervisor you complained to?
A I don't remember her name.
Q So you complained to the -- was it a nurse supervisor?
A Nursing supervisor.
Q Did that occur during your shift on a workday, during a work shift, this alleged assault?
A No, that occurred on an overtime shift.
Q And did you complete the overtime shift?
A Yes, I did.
Q What point in the shift, was it a 3 to 11 or

Page 28

A Not on a daily basis.
Q She didn't give you evaluations for your job, did she?
A She did not give me evaluations for my job.
Q She would get involved if someone complained about an employee or a patient?
A She was involved in complaints, and she acted on those complaints.
Q In paragraph 12 you say, you allege, page 4, "For an extended period of time the Plaintiff has had to work in a hostile and dangerous work environment." Just tell me about what the basis of that allegation is, what are you talking about there?
A Well, I was hurt at work.
Q You were hurt?
A Somebody hit me, yes, bashed me.
Q Who bashed you?
A A woman I worked with on unit 5.
Q Is that Miss Fairbrother?
A Right.
Q Is this when you claim that she body slammed you against the cabinet?
A She did.
Q But that's the claim you're referring to?
A Yes.

A Whether you worked first shift, second shift or third shift, she was the head of the unit, she was unit chief.

Q Right. So if she were there, or if she had an issue with you, would she be considered your supervisor?

A Yes.

Q And would Mr. Lewis be considered your supervisor when you were on third shift when he was assigned?

A Yes, sir.

Q How about Miss Rooth, what was her title?

A Well, she is also a supervisor.

Q A nurse supervisor?

A Yes.

Q What shift?

A The day shift.

Q And what period of time was she your direct supervisor during your employment at Whiting?

A Well, I wouldn't say she was my direct supervisor, she was a nurse working, she was a head nurse working on unit 3 when I went to unit 3.

Q And she was assigned to the first shift?

A She was assigned to the first shift, I was assigned to the second shift as a staff nurse.

Q And would that be during the period of

when you were assigned to unit 3?

A Yes, sir.

Q She never supervised you in a different unit on a regular basis other than unit 3?

A May I say one thing?

Q You can answer my question if you want, sure.

A Well, this is my answer.

Q All right.

A I was on unit 5, they sent me to unit 3 for about six weeks of Miss Caplan is supposed to train me.

Q Is that during your working test period?

A I was having problems with the working test period, I went to a lawyer, the reason -- well, they were ousting me out of there.

Q What I want to know is, tell me the time periods when Miss Caplan was your direct supervisor with respect to allegations in this lawsuit?

A Well, that was between 199 -- approximately between '97 and 2000 or 2001, I'm not quite sure of the dates.

Q Was the six-week period when you were assigned to unit 3, was that when you first began at Whiting during your working test period?

A Yes.

Q And that is not part of this lawsuit; is that

Q One of your claims in this case is discrimination based on your ethnic ancestry?

A Yes, sir.

Q Are you claiming gender discrimination also?

A Yes, sir.

Q You also claim violation of your constitutional rights; is that right?

A Yes, sir.

Q Let me ask you this: When those instances have occurred when you've been disciplined in your mind, received discipline, has your union representative been present?

A Once or twice, not all the time.

Q And when your union representative wasn't present, did you grieve discipline when they weren't present, file a grievance?

A I did.

Q Did you file a grievance every time you were disciplined?

A Not every time, but lots of times.

Q Were any of those grievances ever upheld?

A When you say upheld, what do you mean?

Q I mean where the reviewer agreed with your position that the contract had been violated?

A No.

written -- how about a verbal warning, do you consider that discipline?

A I don't think it is discipline.

Q How about a written warning, do you think that is a discipline?

A I think that is discipline because they put it in your file.

Q And how about a written reprimand, do you consider that discipline? Do you consider that discipline?

A A written reprimand, yes.

Q So the distinction for you is what goes in the personnel file you think is discipline, and what doesn't is not discipline, is that the distinction you're making?

A Yes, in a sense.

Q Now, take a look at Exhibit 1. I want to go through Exhibit 1 and ask some questions about it. In the first paragraph of Exhibit 1 --

A Go through here.

Q You can look at it as a reference if you need to, okay. I'll reference different paragraphs. First of all, you indicated here that you're obviously a black female, and is it Guyanan dissent?

A Guyana. I'm Guyanese, I was.

Page 18

Q So from '95 forward you've always worked a lot of overtime?

A Yes, sir. Correction. When I went to Whiting first they wouldn't allow me to do any overtime because I was a trainee.

Q You mean when you were in your working test period?

A Right.

Q But after you completed your working test period you worked overtime?

A Right.

Q And from that point forward you've always worked a lot of overtime?

A Right.

Q Are you a member of a union?

A Yes, I am.

Q What union?

A 1199.

Q Are you familiar under the union contract or with the policies at Whiting with what is considered discipline?

A Say that again please.

Q Are you familiar with -- do you know under the collective bargaining agreement for your union, what is defined as discipline? Are you familiar with that

Q And do you have occasion to work overtime in your current position?
A Yes, I do.
Q Have you always continuously worked overtime to some degree since 1995 when you came to Whiting?
A Yes, I do.
Q Can you tell me, in the last year can you estimate how much overtime in dollars you put in?
A It varies. Some months it is a lot, some months -- it depends on how much overtime there is.
Q Give me an average, if you can. You can do it monthly or yearly, whatever way you want to do it, but give me an average of how much --
A How much overtime I've done.
Q Yes, in the last year.
A I don't think I can give you an accurate amount of what I've done.
Q Is it your recollection that you work at least one extra shift a week?
A One extra shift?
Q A week.
A No, sir.
Q Less than that or more than that?
A More than that.
Q Estimate for me how many, in a typical month,

be a registered nurse in the state of Connecticut?

A Right.

Q Have you held your license as a registered nurse continuously since 1991?

A Yes, sir.

Q Has your license ever been suspended or revoked for any reason?

A Not that I know of, sir.

Q Have there ever been any complaints filed with the licensing board regarding your license or your right to practice nursing?

A Not that I know of, sir.

Q Have you ever been a party to another lawsuit other than this one?

A Not that I know of, sir.

Q Have you ever testified in any type of legal proceeding on behalf of someone else?

A No, sir.

MR. JORDANO: Let the record reflect I'm showing counsel a copy of what I already premarked as Exhibit 1.

BY MR. JORDANO:

Q Would you take a look at that, Miss Bishop, and tell me if you recognize Exhibit 1. Take a moment to review it if you would like.

Q Yes, as a nurse, yes.

A Oh, I went there I would say two years.

Q So you would have been there what, '93 to '95 as a nurse?

A Somewhere like that.

Q Now, prior to 1993 where were you employed?

A At Connecticut Valley Hospital.

Q And what was your job title there?

A Staff nurse.

Q And what unit were you assigned to, or what department?

A Meritt Hall, they call it ward 42.

Q And how long --

A 41, excuse me.

Q How long did you hold that position?

A Until I left and went to Fairfield Hills.

Q Do you remember how many years? Did you hold it for more than one year?

A '91 to -- about two years.

Q Prior to that, that would take us back to, let's see, '93 to '95, Fairfield Hills. Prior to '93 you told me a couple of years at CVH in unit, is it ward 41?

A Yes.

Q Takes us back to '91. What position did you

3953906c-4bad-4014-a135-e7f9db8962ae

Q I think that is K-A-R-I-N?

A K-A-R-E-N, I think.

Q K-E-R-I-N. And when you were on unit 5, you also worked the 11 to 7 shift also?

A On unit 5?

Q Yes. Or just the 3 to 11?

A No, just 3 to 11.

Q Then you went to unit 3 and you worked the 3 to 11 shift or 11 to 7 shift?

A No, I worked the 3 to 11 shift.

Q And who was the head nurse on unit 3 when you were assigned there?

A Angela Kerin.

Q And did you work the 11 to 7 shift at all on unit 3?

A Yes, I did.

Q Who was the head nurse when you worked the 11 to 7 shift?

A There was one -- we had two head nurses there, one left, it was Miss Toro.

Q Miss Toro?

A Yes. Toro or Tora, something like that.

Q Now, prior to your time when you came to Whiting as a staff nurse, what position did you hold with the state if any?

A I started on unit 5.
Q Would that have been in 1995?
A 1995.
Q And how long did you work on unit 5?
A I'm not quite sure, but probably two years.
Q And then you went to unit 4?
A No, I went to unit 3.
Q How long were you at unit 3?
A From then to a few months ago, January, I think, I went to unit 4.
Q So if I understand it correctly, you began on unit 5 from 1995 till about '97?
A Right.
Q And then you went to unit 3 from 1997 till a few months ago when you went to unit 4?
A Very well.
Q And are you assigned a particular shift?
A I work the night shift.
Q And is that the 11 to 7 in the morning?
A Eleven to 7 shift.
Q And have you always worked that shift when you've been employed at the Whiting Forensic division?
A No, sir.
Q As your regular shift. Okay, what other shifts have you been regularly scheduled for. I'm not

Page 6

A Okay, sir.

Q Are you currently taking any medications that you believe would impair your ability to listen to and answer my questions truthfully today?

A No, sir.

Q Are you currently suffering from my medical conditions that you believe would impair your ability to listen to and answer my questions truthfully today?

A No, sir.

Q You're currently employed at the Whiting Forensic division of Connecticut Valley Hospital, what is your job title?

A I'm a psychiatric forensic nurse.

Q And how long have you held that position, that exact title?

A At the forensic hospital?

Q Yes, at Whiting.

A I went there in 1995.

Q And was that your title, psychiatric forensic nurse beginning in 1995?

A There.

Q Yes, at Whiting?

A Well, I would say no.

Q How long have you held the title psychiatric forensic nurse, that specific job title, how long have

3953906c-4bad-4014-a135-e7f9db8962ae

Page 4

Thelma Bishop,

having been first duly sworn, was examined and testified as follows:

(Defendants' Exhibit 1: Marked for Identification.)

DIRECT EXAMINATION BY MR. JORDANO

Q Would you please state your full name and spell your last name.

A My name is Thelma R. Bishop, B-I-S-H-O-P.

Q And what is your home address, Ms. Bishop?

A Well, I live -- I have a home in Northford, Connecticut, but because of driving and doing a lot of overtime, I took residence just about at P.O. Box 351, Middletown, Connecticut, that's the State's rooms.

Q And where are you employed?

A I'm employed at Whiting Forensic, Connecticut Valley Hospital.

Q And that is division of the Department of Mental Health and Addiction Services; is that correct?

A I think so, I'm not sure.

Bishop vs Ct. Valley Hospital, Whiting Forensic
6/11/2002 Thelma Bishop

Page 2

APPEARANCES:

Representing the Plaintiff
WILLIAMS AND PATTIS, LLC
Dawne Westbrook, Esq.
51 Elm Street
New Haven, Connecticut 06510

Representing the Defendants

OFFICE OF THE ATTORNEY GENERAL
Joseph A. Jordano, Esq.
55 Elm Street
Hartford, Connecticut 06141-0120

Also Present:
Robert Bouthet, Videographer

Brandon Smith Reporting Service

3953906c-4bad-4014-a135-e7f9db8962ae